## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

SALLY GAETJENS,

     Plaintiff,

  v.

     No. 16 cv 50261

CITY OF LOVES PARK et al.,

     Hon. John Robert Blakey
     Magistrate Judge Lisa A. Jensen

     Defendants.

## PLAINTIFF'S MOTION TO RECONSIDER

Plaintiff Sally Gaetjens, through her undersigned attorneys, respectfully requests that this Court, pursuant to Federal Rule of Civil Procedure 54(b), to reconsider the Court's May 2019 order granting the summary judgment motion of the City of Loves Park and individual Defendants Fire Chief Foley and Officer Allton (Dkt. 114).

## Background

In December 2014, Plaintiff owned a home in Loves Park, Illinois, at 5051 Tree Swallow Knotch (the "Loves Park home"). Dkt. 84, ¶8. She owned another residence in Rockford, Illinois, at 7330 Olde Creek Road (the "Rockford home"). Dkt. 96, ¶4. Rosalie Eads lived down the street from Plaintiff's Loves Park home, at 4304 Hollowood, Loves Park, Illinois. Dkt. 84, ¶22. This case was brought as a result of the unlawful search and seizure of Plaintiff's home and the seizure of her cats after Eads called Loves Park Police to request that they check on Plaintiff's well-being at her Rockford home on December 5, 2014.

*The Search and Seizure*

On December 4, 2014, around 8:30 p.m., Rosalie Eads received a call from Plaintiff's doctor, who told Eads that they were attempting to reach Plaintiff and requested that Eads tell Plaintiff to call her doctor. Dkt. 96, ¶2. Eads did not have any idea why Plaintiff would have listed her as a contact, but attempted to call Plaintiff, who did not answer. Dkt. 96, ¶1; Dkt. 81, ¶26. Later that night, Eads visited Plaintiff's Loves Park house to see if she was home. Dkt 96, ¶4. When Plaintiff did not answer the door, Eads was sure that Plaintiff was at her home in Rockford. *Id*.

The next day, in the late afternoon, Eads called Perryville Clinic to see if they were still looking for Plaintiff, but they responded that their privacy policy prevented them from disclosing information on Plaintiff's health. *Id*. at ¶5. Later in the call, the clinic further explained that if Eads had concerns about Plaintiff's well-being, she could call the police. *Id*. at ¶6. Eads then called Loves Park Police to tell them what she knew at the time. *Id*. at ¶4.

Defendant Allton was dispatched to the scene and arrived with another officer, Dan Johnson, later that afternoon, and spoke with Rosalie Eads outside her own home. *Id*. at ¶7. Allton identified himself and asked her if she had a key to Plaintiff's house. *Id*. He did not explain to Eads why he needed the key—according to her, he only said, "Can you get it for me," after Eads stated that she did have a key. *Id*. at ¶¶8-9. Before going to get the key, Eads said, "Can you take me to her

other house? I don't think she's here [at her Loves Park house]. I think she's at her other house." *Id.* at ¶10. Defendant Allton did not respond to Eads' request and instead said, "I need the key." *Id.* at ¶11. Eads obeyed Allton and retried a Walmart bag containing a number of keys, Plaintiff's key among them. *Id.* at ¶12. At the time, Eads did not know which key in the bag was the key to Plaintiff's Loves Park home, so she handed Allton the plastic bag full of miscellaneous keys. *Id.* at ¶13.

Eads was emphatic that she did not want the officers to go to Plaintiff's Loves Park house—she begged Officer Allton not to go into Plaintiff's Loves Park house and to take Eads to the Rockford house, where she believed Plaintiff to be staying. *Id.* at ¶15. As Allton proceeded to Plaintiff's Loves Park house and began searching the curtilage, and throughout his initial search of the house, Eads continued to beg the officers to take her to Plaintiff's Rockford house because she felt she knew that Plaintiff was not in her Loves Park house. *Id.* at ¶16. At deposition, Allton testified that he believed Eads had provided him with authority to consent to a search of Plaintiff's house on her behalf because Rosalie had a key and because he assumed the doctor's office knew she had a key—nothing more. *Id.* at ¶17.

Defendant Foley arrived on scene sometime soon before 4:25 p.m., at which time he called his dispatcher and requested one engine company and fire fighters. *Id.* at ¶¶18-19. At 4:35 p.m., less than ten minutes after he arrived on scene and called dispatch, Foley condemned and placarded the house. *Id.* at ¶21. At 5:13 p.m., the engine company and fire fighters arrived at Plaintiff's Loves Park home. *Id.* at

¶19. After their arrival, the firefighters spent about 15 minutes suiting up and 20 minutes searching Plaintiff's residence. *Id.* at ¶20.

Foley's testimony regarding his actions during these initial moments after arriving on scene was very clear on several very important points. Foley stated that when he arrived, Allton told him to examine the front door of the house, which at that point was cracked open several inches. *Id* at ¶22. Foley testified that he could not see into the house through the front door, approached the door, opened it slightly, smelled the house, closed the door without looking through it into the house, and walked out to the yard to call the engine company. *Id.* at ¶24. At no time before, during or after that point did Foley enter into Plaintiff's house, and at no point did he observe the conditions of the interior of the house. *Id.* at ¶25. Foley stated that he condemned the house *solely based on the smell* and saw nothing else to indicate the condition of the home before he did so. *Id.* at ¶26.

Although Foley's testimony regarding his investigation of the house was clear, Defendants contradicted one another considerably regarding what happened after he smelled the house, returned to the yard, and made the decision to condemn at 4:35 p.m. Defendant Del Rio, a Winnebago County Animal Services officer, testified that he arrived on the scene around this time—about 4:37 p.m. *Id.* at ¶27. At this time, Defendants Foley and Allton discussed the situation with Del Rio. *Id.* at ¶28. According to Del Rio, Defendant Foley asked Del Rio if Animal Services could take the cats, to which Del Rio responded, "I don't believe we can just walk in and take them." *Id.* Del Rio further explained that, typically, Animal Services would leave a

4

written notice for 24 hours of care, and then, if nobody contacted them, Animal Services would return to the house to determine whether someone had been to the house in the meantime. *Id.* Defendant Allton—the only police officer involved in the conversation—added that they would need a warrant to go back inside the house and remove the cats. *Id.* at ¶29.

Undeterred, Defendant Foley proposed another solution—he asked whether Animal Services would take the cats if he condemned the home. *Id.* at ¶30. Del Rio responded that Animal Service possibly could but added that he had never dealt with such a situation before. *Id.* So, Del Rio called his commander, Defendant Kaske, who, after being informed of the situation, stated that, if the home was condemned, the owned could still go inside. *Id.* at ¶31. So, with Kaske on the line, Del Rio asked Foley whether or not the owner would be able to go back into the home and care for the cats after it was condemned. *Id.* at ¶32. Fire Chief Foley responded, "No," and explained that the owner would be arrested if she were found in the home after it was condemned. *Id.* Foley further explained that no one would be able to enter the home unless it was Winnebago County Animal Services to remove the cats. *Id.* at ¶33. And so, Foley condemned the home, and Winnebago County Animal Services removed the cats.[1]

Defendant Foley arrived on scene sometime soon before 4:25 p.m., at which time he called his dispatcher and requested one engine company and fire fighters.

---

[1] The injuries and deaths caused by the removal of the cats was not at issue at Summary Judgment, although Plaintiff discussed these and other issues in greater depth in her response (Dkt. 120) to the Court's Order that she show cause as to why it should not grant summary judgment to the County Defendants, who neither moved for summary judgment nor replied to Plaintiff's response.

*Id.* at ¶¶18-19. At 4:35 p.m., less than ten minutes after he arrived on scene and called dispatch, Foley condemned and placarded the house. *Id.* at ¶21. At 5:13 p.m., the engine company and fire fighters arrived at Plaintiff's Loves Park home. *Id.* at ¶19. After their arrival, the firefighters spent about 15 minutes suiting up and 20 minutes searching Plaintiff's residence. *Id.* at ¶20.

Foley's testimony regarding his actions during these initial moments after arriving on scene was very clear on several very important points. Foley stated that when he arrived, Allton told him to examine the front door of the house, which at that point was cracked open several inches. *Id* at ¶22. Foley testified that he could not see into the house through the front door, approached the door, opened it slightly, smelled the house, closed the door without looking through it into the house, and walked out to the yard to call the engine company. *Id.* at ¶24. At no time before, during or after that point did Foley enter into Plaintiff's house, and at no point did he observe the conditions of the interior of the house. *Id.* at ¶25. Foley stated that he condemned the house *solely based on the smell* and saw nothing else to indicate the condition of the home before he did so. *Id.* at ¶26.

Although Foley's testimony regarding his investigation of the house was clear, Defendants contradicted one another considerably regarding what happened after he smelled the house, returned to the yard, and made the decision to condemn the house at 4:35 p.m. Defendant Del Rio, a Winnebago County Animal Services officer, testified that he arrived on the scene around this time—about 4:37 p.m. *Id.* at ¶27. At this time, Defendants Foley and Allton discussed the situation with Del Rio. *Id.* at ¶28.

6

According to Del Rio, Defendant Foley asked Del Rio if Animal Services could take the cats, to which Del Rio responded, "I don't believe we can just walk in and take them." *Id.* Del Rio further explained that, typically, Animal Services would leave a written notice for 24 hours of care, and then, if nobody contacted them, Animal Services would return to the house to determine whether someone had been to the house in the meantime. *Id.* Defendant Allton—the only police officer involved in the conversation—added that they would need a warrant to go back inside the house and remove the cats. *Id.* at ¶29.

Undeterred, Defendant Foley proposed another solution—he asked whether Animal Services would take the cats if he condemned the home. *Id.* at ¶30. Del Rio responded that Animal Service possibly could but added that he had never dealt with such a situation before. *Id.* So, Del Rio called his commander, Defendant Kaske, who, after being informed of the situation, state that, if the home was condemned, the owned could still go inside. *Id.* at ¶31. So, with Kaske on the line, Del Rio asked Foley whether or not the owner would be able to go back into the home and care for the cats after it was condemned. *Id.* at ¶32. Fire Chief Foley responded, "No," and explained that the owner would be arrested if she were found in the home after it was condemned. *Id.* Foley further explained that no one would be able to enter the home unless it was Winnebago County Animal Services to remove the cats. *Id.* at ¶33. And so, Foley condemned the home, and Winnebago County Animal Services removed the cats.[2]

---

[2] The injuries and deaths caused by the removal of the cats was not at issue at Summary Judgment, although Plaintiff discussed these and other issues in greater depth in her response (Dkt. 120) to the

*The Condition of the House*

On December 4, 2014, Plaintiff had been told by her doctor that she should go to the hospital due her medical condition. Dkt. 81 at ¶14. It was not such an emergency that they forced her to take an ambulance, however, and she opted instead to drive herself to her Rockford and Loves Park homes first to feed her cats and make arrangements for their care. *Id*. at ¶15. Among other things, she arranged for her friend, Joan Klarner, to care for her cats while she was gone. Dkt. 96 at ¶34. Klarner holds a Bachelor of Science degree in Animal Science from the Ohio State University, has judged cats for 50 years as an AFCA official, had judged livestock before that, was a cat breeder for many years, and her husband was a veterinarian (he passed after December 2014). *Id*. at ¶35.

Klarner arrived at Plaintiff's Loves Park house with her husband to care for Plaintiff's cats on December 5 at about 11 a.m. *Id*. at ¶36. For two hours, they fed the cats, cleaned out a Breeze box (a type of receptacle for cat feces), ran the dishwasher, and washed several dishes for the cats' food. *Id*. at ¶36. Klarner testified that at no point did she feel the need to go outside to get fresh air and that she did not feel that the house needed ventilation. *Id*. She was not concerned for her health at all based on the smell of the house, and neither her husband's nor her clothes smelled like cat urine as a result of spending two hours in the house. *Id*.; *cf*. Dkt. 81 at ¶¶59-61. While Klarner was at Plaintiff's house, she visited every area of the house, save the bedroom, where Plaintiff had kept a cat that she was treating

---

Court's Order that she show cause as to why it should not grant summary judgment to the County Defendants, who neither moved for summary judgment nor replied to Plaintiff's response.

separately with intravenous fluids. *Id.* at ¶37. Klarner stated that the house did not appear to be in disrepair: no plants had been knocked over; there were no kibble or pellets on the floor; no long-term stains on the floor; no film of urine on the floor or the baseboards of the house; no vomit on the floor. Compare *Id.* with Dkt. 81 at ¶¶59-61. Klarner stressed that the condition of Plaintiff's house and the inside were such that she did not feel it was unsafe for a human being to live there; nor did she consider the condition of the Breeze boxes to be unsafe for cats. *Id.* at ¶38. She unequivocally stated that in her opinion the conditions of the house did not pose a danger to the health of any of the cats. *Id.*

Klarner further explained that Plaintiff's male cats might "spray," or urinate, in the presence of females, and so Plaintiff was careful to keep the males in the basement, apart from the female cats above. *Id.* at 39. Klarner explained that, were the males to "spray," it would likely require a change in clothes.

Klarner and her husband left Plaintiff's house at about 1 p.m., several hours before the call from Rosalie Eads' that lead to the search and seizure of Plaintiff's house and the seizure of her cats. *Id.* at ¶36.

*Procedural History*

Defendants Foley, Allton, and the City of Loves Park moved for summary judgment on all counts of Plaintiff's complaint, raising the issue of qualified immunity in less than one page of a brief that contained no citations to the record at any point in their argument. Dkt. 84 at 14-15. Even where Defendants were required by the rules to cite to the record, Plaintiff was obligated to object and move

9

to strike a majority of the "Undisputed Facts" propounded in Defendants' Rule 56.1 Statement (Dkt. 81). *See* Dkt. 95. In many cases, Plaintiff's grounds for objecting and moving to strike was that Defendants' alleged "fact" was not supported by Defendants' citation to the evidence. *See* Dkt. 95 at Responses to ¶¶ 1, 8, 9, 10, 12, 27-29, 32-35, 39, 40, 47-50, 53-56, 58, 60-62, 64, 66-71, 74, 75.

In response to Defendants' motion, Plaintiff filed a motion for leave to file an oversized brief that was 33 pages long, excluding cover page, table of contents, table of authorities, signature page, and certificate of service. *See* Dkts. 97, 97-1. The Court denied Plaintiff's motion in a minute order limiting Plaintiff's motion to 20 pages. Dkt. 103. As a result, Plaintiff cut 13 pages and filed a 20-page response to Defendants' motion for summary judgment. Dkt. 104. Defendants filed a reply. Dkt. 108.

On May 2, 2019, the Court granted summary judgment to *all* Defendants—including the Winnebago County Defendants who had not moved for summary judgment—and closed the case. Dkt. 114. The court claimed that plaintiff provided "virtually no focused argument as to whether [the] purported violations were clearly established on the night that plaintiff's house was condemned." *Id.* at 1. In a 12-page, single-spaced opinion, the Court found that (1) Plaintiff had waived her challenge to qualified immunity for Allton's warrantless search of the house; (2) that Plaintiff's qualified immunity argument for the seizure of the house failed to show that Defendants' had violated a clearly established right (prong 2 of the two-step qualified immunity analysis under *Harlow v. Fitzgerald*, 457 U.S. 731 (1982));

10

(3) that Plaintiff's qualified immunity argument for the seizure of the cats failed under the second prong as well; (4) that Plaintiff's Conspiracy claim and theory of *Monell* liability failed because of the above rulings. *Id.*

On May 3, 2019, one day after closing the case, the Court realized that only Defendants Foley, Allton, and Loves Park had moved for summary judgment, and modified its previous order to limit summary judgment in favor of them only. Dkt. 115. However, the Court further ordered Plaintiff to show cause why the Court should not grant summary judgment to the remaining Winnebago County Defendants. *Id.* The Court ordered Plaintiff to respond by May 17, 2019 and Defendants to reply by May 24, 2019. *Id.*

On May 10, 2019, Judge Kapala assumed senior status.[3] On May 13, 2019, the case was reassigned to this Court. Dkt. 117.

## Argument

Federal Rule of Civil Procedure 54(b) provides that a court may alter or amend an interlocutory order any time before the entry of final judgment. *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 450 U.S. 1, 12 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."). Unlike a motion to reconsider a final judgment, which must meet the requirements of Federal Rules of Civil Procedure 59 or 60, "a motion to reconsider an interlocutory order may be entertained and granted as justice requires." *Akzo Coatings, Inc. v. Ainger Corp.*, 909 F. Supp. 1154, 1160 (N.D. Ind. 1995).

---

[3] *See* Court information release, February 21, 2018,
https://www.ilnd.uscourts.gov/_assets/_news/JudgeKapalaSeniorStatus%20Press%20Release.pdf

Reconsideration of an interlocutory order may be appropriate when the facts or law on which the decision was based change significantly after issuance of the order, or when "the [c]ourt has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the [c]ourt by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 908 F.2d 1185, 1191 (7th Cir. 1990). "These grounds represent extraordinary circumstances, and the granting of a motion to reconsider is to be granted only in such extraordinary circumstances . . .Indeed, the court's orders are not mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *United States Securities and Exch. Comm'n v. National Presto Indus., Inc.*, No. 02-C-5027, 2004 U.S. Dist. LEXIS 7392, *2 (N.D.Ill. Apr. 28, 2004) (internal quotations omitted). Motions to reconsider serve a limited function: "to correct manifest errors of law or fact or to present newly discovered evidence." *Cisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1269 (7th Cir. 1996). A party seeking reconsideration can't introduce new evidence or legal theories that could have been presented earlier or simply rehash previously rejected arguments. *Id.*

## I.   The Court's dismissal of Plaintiff's *Monell* claim was a clear misapplication of the law.

The full text of the Court's ruling on the *Monell* claim is excerpted here:

> Similarly, plaintiff's <u>Monell</u> claim against the City of Loves Park and Winnebago County fails because the court has found no underlying constitutional violation. <u>See Alexander v. City of South Bend</u>, 433 F.3d 550, 557 (7th Cir. 2006). Like the conspiracy claim, a finding of qualified immunity dooms the <u>Monell</u> claim. <u>See Horton v. Pobjecky</u>, No. 12 C 7784, 2017 WL 5899694, at *8 (N.D. Ill. Mar. 20, 2017) (citing <u>Sallenger</u>

12

> v. City of Springfield, 630 F.3d 499, 504 (7th Cir. 2010)) ("[A] municipality cannot be liable under Monell when there is no underlying constitutional violation by a municipal employee."). This court grants summary judgment on plaintiff's Monell claim as well.

Dkt. 114 at 12-13. First, contrary to the Court's claim in the first sentence, it made no findings regarding the underlying constitutional violations—the court expressly limited its holding to the second prong of the qualified immunity analysis. *See id*. at 6 ("[F]or the reasons stated below, the court finds that plaintiff has failed to meet her burden with respect to the second prong of the qualified immunity test, which requires dismissal of plaintiff's claim as to all three events."). *Alexander v. City of South Bend*, the case the Court cites in support of this proposition, contains no analysis related to qualified immunity—the word "immunity" appears nowhere in the opinion.

The court then states that "the finding of qualified immunity dooms the *Monell* claim." Dkt. 114 at 12 (citing its decision in *Horton v. Pobjecky*, No. 12 C 7784, 2017 WL 5899694, at *8 (N.D. Ill., Mar. 20, 2013)). Yet in *Horton* the Court specifically declined to reach the qualified immunity issue. *Id*. at *8 ("Based on this finding [of no underlying constitutional violation], the court need not address defendants' qualified immunity argument."); *id*. at *10 ("Since there was no constitutional violation, the court need not reach defendants' qualified immunity argument."). Even where the Court briefly addressed the possibility of a qualified immunity argument, its holding regarding *Monell* liability in no way stands for the proposition that a finding of qualified immunity based on the "clearly established law" prong precludes *Monell* liability. *See id*. at *10 ("Because the court holds that

Pobjecky acted reasonably under the circumstances, it follows that Sheriff Caruana cannot, as a matter of law, be held liable to plaintiff as his liability is dependent upon Pobjecky's actions. . . . Therefore, since this court finds that no excessive force occurred or, in the alternative, that Pobjecky is entitled to qualified immunity, there is no underlying constitutional violation and Sheriff Caruana and thereby Winnebago County cannot be liable under *Monell*."). The Court also cites *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010)) for the proposition that a "municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." Dkt. 114 at 12. Yet, in *Sallenger*, the district court specifically found that the individual defendants were *not* entitled to qualified immunity and the Seventh Circuit upheld this finding. *Id*. at 502. The plaintiff's claims proceeded to a jury trials in which the individual defendants were cleared of any constitutional wrongdoing. *Id*. at 504. On appeal, the plaintiff did not challenge these verdicts but did challenge the district court's earlier entry of summary judgment on the *Monell* claim by reference to the evidentiary record made on summary judgment. *Id*. at 504-05. On appeal, because the jury verdicts were law of the case and established that no excessive force occurred, there was no underlying constitutional violation for which the city could be held liable. *Id*. at 505. Not so, here.

Here, the Court made no specific findings regarding whether an underlying constitutional violation occurred. Instead, the Court avoided addressing Plaintiff's arguments regarding the underlying constitutional violation and instead focused on

14

the "brevity" of Plaintiff's arguments regarding the second prong of qualified immunity—that is, whether, "assuming plaintiff can demonstrate that her Fourth Amendment rights were violated, that it would be sufficiently clear to a reasonable officer in defendants' shoes that they were violating a clearly established law." Dkt. 114 at 5.

However, the City of Loves Park, as a municipal entity, does not enjoy absolute or qualified immunity from section 1983 suits. *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980). In addition, "[g]ranting of qualified immunity on the "clearly-established" prong is not the same as holding that no constitutional violation occurred. That would conflate the two prongs of qualified immunity." *Bustillos v. El Paso Cty. Hosp. Dist.*, 891 F.3d 214, n.6 (5th Cir. 2018) ("Thus, a grant of qualified immunity based on the "clearly-established" prong does not necessarily negate the constitutional violation element of a county liability claim, as the district court erroneously assumed."); *See also Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 61-63 (2d Cir. 2014); *Veneklase v. City of Fargo*, 78 F.3d 1264, 1268-70 (8th Cir. 1996). Even in the absolute immunity context, "the absolute immunity of [a city's] policymakers does not shield a city from liability for its policies." *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018). Indeed, it is possible, albeit unusual, for an organization to be liable even if its individual agents are not. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) ("But unusual does not mean impossible, and this case well illustrates why an organization might be liable even if its individual agents are not.") (en banc). "The

central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation." *Id*. Here, as the Court observed in its order denying Defendants' motion to dismiss, Plaintiff's *Monell* claim is premised on the actions of Loves Park Fire Chief Foley as final policy maker for his municipality. Dkt. 35 at 4 (citing *McGreal v. Ostrov*, 368 F.3d 657, 685 (7th Cir. 2004) ("It is true that a single act or decision of a final policymaker can establish municipal policy.").

Here, the Court's opinion ignores all of the above principles. The Court does not address the principle that municipalities cannot be shielded by either absolute or qualified immunity. It ignored the distinction between qualified immunity based on the first prong *Heller* (whether there was an underlying constitutional violation) and the second prong (whether the right violated was clearly established). The court glossed over the fact that it specifically declined to consider the merits of the arguments regarding the underlying constitutional violations, instead focusing on its claim that Plaintiff had waived its argument regarding the second *Heller* prong. Indeed, the court conflated cases in which *Monell* claims were dismissed because they relied entirely on an underlying violation that was determined not to have occurred with the instant case, in which the Court dismissed the claims against individual defendants based solely on the "clearly established law" prong of *Heller*. Moreover, the Court cited no authority in support of its claim that "a finding of qualified immunity dooms the *Monell* claim" where the finding of qualified immunity is based on this second prong. Dkt. 114 at 12. Plaintiff has not been able

to find an analogous case in support of this unusual proposition. Even if there were a case that support this proposition generally, it would not follow that a municipality would enjoy immunity where, as here, the municipality's policy directly caused the constitutional harm at issue. Nor does the Court's opinion address this scenario.

At bottom, the Court's grant of summary judgment on the *Monell* claim applied an inappropriate legal standard, resulting in a decision that was a manifest error of law. This court should reverse its ruling and deny summary judgment for the *Monell* claims. In the alternative, this court should permit a more comprehensive briefing on the issue, as it was not properly developed either by the Defendants' motion for summary judgment or in the Court's opinion, and thus it would be inefficient to do so for the first time on appeal.

## II. The Court's granting summary judgment on qualified immunity was a manifest error of law and fact.

The Court's finding of qualified immunity for Defendants Allton and Foley was manifest error for several reasons. First, the Court significantly reconfigured Defendants' qualified immunity argument, raising issues that Defendants had not raised in their motion for summary judgment and that were thus outside the adversarial issues presented by the parties to the Court. As a result, the court improperly determined that Plaintiff had waived its argument on specific points not raised by the Defendants. This was a manifest error of law regarding the respective burdens of both the Defendants and the Plaintiff at summary judgment, an error

17

exacerbated by the court's own actions in improperly denying Plaintiff's request for leave to file additional pages in response to Defendants' vague and scattershot brief.

Second, the Court patently misunderstood Plaintiff's arguments opposing qualified immunity. As a result, it misapplied the relevant legal precedent regarding qualified immunity.

Third, the Court misapprehended disputed facts that were material to the issue of qualified immunity. As a result, the Court erred in determining that no material issue of fact existed that would preclude summary judgment.

   A. *The Court ignored Defendants' inadequate presentation of their qualified immunity argument and instead articulated a qualified immunity argument of its own.*

As an initial matter, Defendants' brief does not adequately present a "clearly established law" argument. Although Defendants provide a boilerplate citation to the list of significant qualified immunity cases, they applied none of them to the evidence at issue for summary judgment. *See* Dkt. 84 at 14-15. The closest that the Defendants' brief comes to articulating a qualified immunity argument are two conclusory statements: (1) "[T]o the extent that this Court determines that the alleged conduct caused a constitutional violation, the defendants are entitled to Qualified Immunity because the procedures used at the time, [*sic*] were not clearly unconstitutional;" (*Id.* at 14) and (2) "Under the circumstances there was not only a reasonable basis to condemn the house due to the unsanitary condition, but a basis to condemn the home until such time as it was cleaned" (*Id.* at 15). From these lines, it is not clear what particular circumstances Defendants refer to (at no point in their 7-page argument do they cite to the record) nor whether they even assert

18

qualified immunity on behalf of Defendant Allton at all. Nor is it clear from the argument how the assertion as to Defendant Foley differs from their argument regarding the underlying constitutional violation of the seizure of the house.

These statements fail to adequately raise the qualified immunity issue so that Plaintiff could meaningfully respond without speculating as to which issues Defendants contend are beyond dispute. Although Plaintiff bears the burden of establishing that there has been a constitutional violation and that the constitutional standards were clearly established at the time of the violation, *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007), in the context of the summary judgment motion, Defendants have the initial burden of demonstrating that there is no genuine issue of fact as to that question and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

To the extent that Defendants articulated a qualified immunity argument beyond conclusory allegations, it was to reiterate that Defendant Foley's actions did not constitute a Fourth Amendment violation. *See* Dkt. 84 at 15. This is not enough to adequately raise the issue of whether there is no genuine issue of fact at summary judgment for each and every argument Defendants raised regarding the underly constitutional violations. *See Draine v. Bauman*, 708 F. Supp. 2d 693, 706 (N.D. Ill. 2010) ("The defendants' failure to have based their argument for qualified immunity on anything beyond the claimed non-existence of a Fourth Amendment

violation in their supporting memorandum constituted a waiver of the qualified immunity argument to the extent it rested on some other theory.") (citing *Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000). "So important are these principles to the adversary system and to basic institutional considerations that they apply even where constitutional issues are involved." *Id.* (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

Even so, Plaintiff offered more than enough to show that Defendants cannot be found entitled to qualified immunity on the sparse issues raised in their motion. "It is unnecessary for a plaintiff to offer a case that is directly on point to defeat an assertion of qualified immunity, *Hope v. Pelzer*, 546 U.S. 730, 741 (2002), or even one that is 'fundamentally similar.' *T.E. v. Grindle*, 599 F.3d 583, 590, 2010 U.S. App. LEXIS 5503, *16 (7th Cir. 2010)." *Id.* at 706-07. In discussing what is required, the Seventh Circuit elaborated on the Supreme Court's decision in *Hope v. Pelzer*:

> [E]ven where there are notable factual distinctions between the precedents relied on and the case before the Court, if the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights they can demonstrate clearly established law. While Fourth Amendment inquiries are fact intensive, officials can still be on notice that their conduct violates established law even in novel factual circumstances. Accordingly, the salient question here is not whether there is a prior case identical to the [plaintiff's] current claim but whether the state of the law at the relevant time gave the Defendants fair warning that their treatment of [plaintiff] was unconstitutional.

*Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010) (cleaned up).

Because of the narrowness of the qualified immunity argument in Defendants' brief, Plaintiff had no chance to fairly meet every argument that might be implicated by Defendants' conclusory statement and rote citation to a boilerplate

20

rule statement. At its core, Defendants argument raised no issue regarding Defendant Allton's immunity. Nor did it articulate an argument with respect to Defendant Foley beyond its prior assertions that his actions were not unreasonable.

Yet, the Court found that it was Plaintiff, not Defendants, who provided "virtually <u>no</u> focused argument as to" qualified immunity. To be sure, Plaintiff's argument regarding qualified immunity was more developed in her initial response to Defendants' motion for summary judgment, which was 34 pages long (Dkt. 97-1), due to Defendants' vague argument on the merits of the constitutional violations, lack of any citations to the record in their argument, and allegations of fact in their argument which have no support in the record.[4] For example, Defendants' reckless and vague treatment of facts in their argument regarding exigent circumstances was just under a page long (Dkt. 84 at 9-10) but required approximately 5 pages to address (Dkt. 97-1 at 12-17) because Plaintiff was first required to speculate as to where in the record Defendants might have drawn their facts and then systematically illustrate that there could be no dispute that none of the facts relied upon by Defendants in their argument were known to the officers at the time they made the decision to search Plaintiff's house. Dkt. 97-1 at 12-17. Similarly, in response to Defendants' qualified immunity argument, Plaintiff carefully responded

---

[4] Regarding deliberate misstatement of facts, see, for example, Defendants' deliberate confusion of Joan Klarner—a key witness for the Plaintiff's case regarding the condition of Plaintiff's house—with Joan St. Clair, a neighbor of Plaintiff who was alleged to have been present while Defendants were searching the house and seizing Plaintiff's cats. See Dkt. 81 at ¶¶69-71. Defendants claim that during this time, Joan Klarner did not tell police where Plaintiff was, or that Joan had entered the house that day to feed and water the cats, suggesting that her testimony was in some way fabricated. *Id.* In both her response to Defendants' Rule 56.1 statement and throughout her brief, Plaintiff was forced to respond to numerous liberties that Defendants took with the record. *See, e.g.*, Dkt. 95 at ¶¶69-71; Dkt. 104 at 4-7.

to various arguments that Defendants' *might* have been making in their vague statements regarding Foley's decision to condemn and the "procedures used at the time." Dkt. 84 at 14.

Yet Defendants' strategy appeared to have succeeded, as the Court denied Plaintiff's motion for leave to file an oversized brief was denied. Dkt. 103. "In light of the defendants' brief being 15 pages long," the Court reasoned, "the plaintiff may file a 20-page response brief." *Id.* Thus, on the one hand, the court prohibited Plaintiff from thoroughly addressing Defendants' reckless, "shotgun" approach to the facts and arguments in this case; on the other, the Court extrapolated Defendants' qualified immunity argument far beyond the scope in which it was presented, only to find that Plaintiff had waived its argument on this point, despite her best efforts to thoroughly address the most developed arguments that Defendants had presented. This is manifestly unfair, and certainly was not the most effective way in which the issues which the Court ultimately found to be dispositive could be properly briefed before the Court.

   B. *The Court mischaracterized Plaintiff's qualified immunity argument and misapprehended material facts which were in dispute.*

This had significant consequences, as the Court's misapprehending Plaintiff's qualified immunity argument caused it to misapply the relevant legal analysis here. Again, due to the sparse nature of Defendants' brief on this point, Plaintiff was forced to address the only argument that Defendants appeared to have raised regarding this issue.

As discussed above, Defendants' qualified immunity argument was limited to two points. The first was that, "to the extent that this Court determines that the alleged conduct caused a constitutional violation, the defendants are entitled to Qualified Immunity because the procedures used at the time, [*sic*] were not clearly unconstitutional." Dkt. 84 at 14. To the extent that the Defendants made *any* additional argument regarding qualified immunity, it was limited to this: "Under the circumstances there was not only a reasonable basis to condemn the house due to unsanitary condition, but a basis to condemn the home until such a time as it was cleaned." *Id*. at 15.

Defendants did not argue the clearly established law prong with respect to the emergency exception. The court found that the Plaintiff waived this argument, without considered whether the Defendants had even made it. Even if Defendants had made such an argument, it would clearly fail—the law clearly establishes the contours of the exigent circumstances and emergency exceptions to the warrant requirement—the Plaintiff briefed these issues thoroughly in their discussion of the underlying constitutional violation. With respect to qualified immunity, Defendants' only argument on this point was that there was no underlying constitutional violation. They made no argument regarding whether clearly established law existed on this point—doing so would require them to argue that there is not an identical case, which clearly goes beyond what the clearly established prong requires.

In this respect, the court ignored a clear dispute of material fact. Namely, that Rosalie Eads testified that Plaintiff was likely <u>not</u> in the house and that she

specifically requested that police check her residence in unincorporated Winnebago County. Plaintiff disputed that there was *any* evidence that Plaintiff required emergency aid or that she was present in the house at the time. It is clearly established law that the emergency exception emphatically "does not permit the police to enter someone's home or hotel room without a warrant based solely on an inchoate hunch that an injured person might be present. . . there must instead be concrete fats that someone inside needs medical attention." *United States v. Arch*, 7 F.3d 1300, 1304 n.3 (7th Cir. 1993) (cited and quoted in Dkt. 104, pp.4-5).

In their argument, Defendants provided no citation to undisputed facts in the record to justify their believe that an emergency existed. Even so, Plaintiff was forced to deduce from Defendants' argument, the portions of their Rule 56.1 statement that corresponded to the conclusions of facts relied upon in their argument. As Plaintiff meticulously demonstrated, all of the facts alleged in the argument were either unknown to the officers at the time of the search, not contained in the Defendants Rule 56.1 statement (or supported by the record), or plainly contracted or disputed by the record itself. Plaintiff even went so far as to identify the one fact that *could* support Defendants' argument—that Eads received a call form Plaintiff's doctors. However, what she was told and what she told the officers was disputed. It was Plaintiff's position that Eads was told by the doctors to have Plaintiff call them. This fact, standing alone, obviously would not be enough to show that a medical emergency existed within the house when officers arrived on scene. It would not even be enough

24

to suggest that a medical emergency existed the day before when Eads received the call from Plaintiff's doctors.

In sum, there was no dispute that the emergency exception to the warrant requirement was clearly established. Defendants made no argument that it was not clearly established. Plaintiff meticulously refuted Defendants' argument that there was no dispute that an emergency existed. There was no need for Plaintiff to subsequently point to another instance of an identical non-existent emergency in the caselaw—the relevant caselaw was clearly laid out and argued in Plaintiff's argument regarding the constitutional violation. Tellingly, in their reply on the qualified immunity issue, Defendants did not argue that the issue whether the emergency exception applied was well-established. Instead, Defendants re-argued the merits of the apparent authority issue and, with regard to the clearly-established prong, pulled out of context Plaintiff's passing comment that Defendants' bizarre argument was "novel" as a concession that the right violated here was not clearly established.

In addition, the Court failed to adequately address the core of Plaintiff's qualified immunity argument here. That Defendant Foley's conduct was so objectively unreasonable that he was either plainly incompetent or knowingly violated the law. In addition, Plaintiff argued that to the extent that Defendants appeared to argue that "the procedures" followed by Foley were not clearly unconstitutional, the condemnation procedures on which he relied provided no exception to the warrant requirement. Indeed, similar arguments had been clearly

and consistently rejected to the point that a reasonable actor in Foley's position should have known that his actions rose to the level of a constitutional violation.

On this point, Plaintiff cited to *Conner v. City of Santa Ana*, 897 F.2d 1487 (9th Cir. 1990) for the proposition that condemnation may not create a "process exception" to the requirement of a warrant. *Conner*, 897 F.2d at 1491. [cite to plaintiff's brief]. The Court buried its consideration of this argument in a footnote, finding (1) that Conner was unpersuasive because it involved entry onto private property to seize "condemned automobiles—not the condemnation of an entire home," and (2) that *Conner* involved a vigorous dissent by Judge Trott that various circuits have agreed with. Dkt. 114 at 8, n. 6. On the first point, to the extent the "clearly established" prong looks to prior decisions, it does so in order to ensure that the "rights contours must be sufficiently clear." *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (internal quotation omitted). If a "process exception" to the warrant requirement has been rejected in the case of entry onto private property to seize condemned automobiles, then that is the boundary: it does not follow that an even greater depravation with even less process—the seizure of a house via ad-hoc condemnation—could fall within such an exception. Nor should it follow that such an outlier need exist in the caselaw, when the same argument was rejected in *Conner* under even more favorable circumstances.

On the second point—the resonance of Judge Trott's "vigorous dissent" in *Conner*, the Court's cites to an Illinois appellate decision, *Redwood v. Lierman*, 331 Ill. App. 3d 1073, 1093 (4th Dist. 2002), as an example of one of the "various circuits

26

[that] have agreed with" this dissent. Dkt. 114 at 8, n. 6. To the extent that this implies that the appellate courts in Illinois have agreed with Judge Trott's dissent, this misstates the law. In fact, the opposite is the case: in *Redwood*, the fourth district court of appeals *adopted* the majority's reasoning in *Conner*. *See Redwood*, 331 Ill. App. 32 at 1083-84, 1089-90. The pincite provided by this Court (*Id*. at 1093) is to the *dissent* in *Redwood*, which should not be said to reflect the Fourth District's agreement to the dissent in *Conner*. Indeed, *Redwood* illustrates *Conner*'s relevance to the "clearly established" prong here. Although "a Ninth Circuit decision is not binding precedent for this [C]ourt," its adoption as the controlling precedent at the state level weighs in favor of finding that it has been clearly established—it is the law of the land of which the Defendants ought to have known at the time.

Indeed, in *Redwood*, the defendants argued that qualified immunity shielded them from liability because the rights at issue were not clearly established at the time. *See id*. at 1089. On this point, the court wrote:

> [W]hile cases with the identical set of facts are unnecessary, there must be cases that are sufficiently analogous that "reasonably diligent governmental officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly." . . . We have already cited and discussed *Bezayiff and Conner*. The fourth amendment violations in those cases are factually similar to the alleged violation in this case. Other cases are likewise persuasive even though the cases did not involve the towing of cars. In *Camara*, 387 U.S. at 534, 18 L. Ed. 2d at 938, 87 S. Ct. at 1733, the fourth amendment forbade a municipal health inspector from entering and inspecting someone's apartment without a warrant. In *Oliver*, 466 U.S. at 180, 80 L. Ed. 2d at 225, 104 S. Ct. at 1742, the Supreme Court held that the curtilage is considered party of the home itself for purposes of the fourth amendment. From those holdings it should have been apparent that the warrantless seizure of a chattel lying with the curtilage of a home ordinarily is unconstitutional. Compare *Conner*, 897 F.2d at 1492 (in which the court said (responding to a

claim of qualified immunity): "[I]n light of *Tyler* it is difficult to understand how the law requiring a warrant was anything less than clear").

*Id.* Again, it is difficult to understand—given the caselaw regarding searches and seizures of curtilage and residences in order to seize condemned *chattel*—how the law requiring a warrant or similar judicial oversight could be less than clear for the search and seizure of a house and the seizure of the cats inside it. Even Defendant Allton confirmed as much at the time of the condemnation, when he explained that the police would need a warrant to enter the house and seize the cats—an explanation that prompted Defendant Foley's decision to condemn the house as a workaround.

Without more, a whiff of cat urine (Defendant Foley made the decision to condemn the building based solely on the smell, without viewing the interior of the house) is not an emergency sufficient to justify an exception to this requirement. Additional caselaw on this point need not exist—as Plaintiff argued in her brief—for this case fits squarely within those in which the constitutional violation is so obvious that a reasonable state actor would know what they are doing violates the Constitution. *See Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001).

The contours of this right could not be more definite: it is clearly established that, "except for a few specifically established and well-delineated exceptions, searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment. Obviously the same rule applies to seizures." *Redwood*, 331 Ill. App. 3d at 1083 (citing *Katz v. United States*, 389 U.S. 347, 357 (1967), *United States v. Place*, 462 U.S. 696, 701 (1983)) (emphasis in original) (internal quotations omitted); *see also*, *id.* at 1081 ("Even if a

public official enters a private building with the intention of abating a nuisance, the official ordinarily must have a warrant.") (citing *Michigan v. Tyler*, 436 U.S. 499, 504-05 (1978). If the principle that unwarranted searches and seizures of or in the home can be said to be a per se rule at all it must protect against idiosyncratic attempts to establish new exceptions to the rule. Otherwise, the rule would be turned inside-out: instead of "specifically established and well-delineated exceptions" to a per se prohibition against warrantless searches, any exception will suffice as long as it has not been expressly rejected in a prior court opinion.

Put another way, the per se rule against warrantless searches and seizures in the home is not a generality "lurking in the broad history and purposes of the Fourth Amendment;" it is a clear prohibition that puts officers on reasonable notice that such conduct is prohibited only under specific and clear exceptions. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Here, Defendants argued generally they were "entitled to Qualified Immunity because the procedures used at the time, [*sic*] were not clearly unconstitutional." Dkt. 84 at 14. If anything, this appears to vaguely assert a "process exception" that was specifically rejected—under much more procedurally sound circumstances—in both *Conner* and *Redwood*.

This is not a case where plaintiff threatens to "convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights," such as in the extremely fact-dependent situation of an excessive force claim. White v. Pauly, 137 S.Ct. 548 (2017). Here, the warrant requirement has remained as established and unaltered as has the concept of

probable cause, which "has not changed in a great many years. *Boyce v. Fernandes*, 77 F.3d 946, 948 (7th Cir. 1996) ("Where the only issue bearing on immunity is whether the defendant had probable cause to make the search or arrest that is challenged, merits and immunity merge; the dispositive question is simply whether the defendant did have probable cause."). The new rule applied by the Court is that when officers recognize that they would need a warrant to seize personal property within a residence, they may circumvent the warrant requirement by condemning and seizing the house, even if the relevant statute prohibits condemnation under the circumstances and in the manner they seek to do so. This is a manifest error of law.

## <u>Conclusion</u>

Plaintiff respectfully requests that this Court reconsider and vacate its prior order granting summary judgment in favor of Defendants Allton, Foley, and Loves Park, and deny Defendants' motion for summary judgment, or, in the alternative, request that the parties brief the limited issue of qualified immunity—or any other issue the court deems necessary—so that the record can be properly developed on appeal.

Respectfully Submitted,

s/ Andrew D. Finke
        Attorney for Plaintiff

Andrew D. Finke, Esq.
Holly N. Blaine
BLAINE & VANZANT, LLP
922 Davis Street
Evanston, Illinois 60201
Phone: (312) 788-7584
E-mail: hnb@blainevanzant.com

30

E-mail: adf@blainevanzant.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the foregoing document was filed and served on all attorneys of record via the Court's ECF system.

s/Andrew D. Finke
Attorney for Plaintiff